IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


H. ROY CARROLL,

        Plaintiff,

v.                                           CIV 00-99 MV/KBM

TOM NEWTON, Warden,
Cibola County Correctional Center, et al.,

        Defendants.


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

When Idaho was constructing new prison facilities, H. Roy Carroll and other prisoners were transferred to the Cibola County Correctional Center ("CCCC") in New Mexico for one year. Seeking an injunction and damages on behalf of a class, three prisoners brought this action alleging numerous unconstitutional prison conditions at CCCC. The class action assertion, the claim for injunctive relief, certain other claims, and two Plaintiffs were previously dismissed by District Judge Martha Vázquez.[1] Carroll is the sole remaining Plaintiff.

This matter is presently before the Court on, among other things, Defendants' *Martinez* Report and Motion for Summary Judgment. *Docs. 53, 54.* I have carefully considered the entire record, arguments of the parties, and relevant law. I recommend that summary judgment be granted in favor of Defendants and this matter dismissed with prejudice.

---

[1] *See Doc. 56* at 2 (setting forth duration of confinement); *Doc. 51* (denying class action relief; dismissing Plaintiff Westmoreland); *Doc. 42* (injunctive relief moot, dismissing Plaintiff VanNewkirk's claims; case to proceed for damages only on remaining claims); *Doc. 14* (dismissing law library and related access to courts claims and inmate classification claim).

# I. Summary Judgment Standard & Clarification of the Claims

Defendants rely on affidavits submitted in support of their opposition to injunctive relief as well as affidavits attached to their reply that address the new allegations Carroll raises in his responses. Carroll argues that the affidavits are insufficient because certain facts the affiants assert they have personal knowledge of are not separately supported by a document or other "proof." *See generally Doc. 55.* However, affidavits alone can constitute competent evidence for summary judgment purposes. For example, under Rule 56, summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, ***together with the affidavits,*** if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added).

In addition, the Tenth Circuit rejected an argument that entry of summary judgment following submission of *Martinez* Report constituted "trial by affidavit." *Shannon v. Graves,* 257 F.3d 1164, 1166-67 (10th Cir. 2001). The Tenth Circuit recently summarized the nature and permissible use of a *Martinez* Report in a summary judgment posture:

> We have long permitted use of a court-authorized [*Martinez*] report by prison officials as part of the determination as to "whether a *pro se* prisoner's allegations have any factual or legal basis." *See Northington v. Jackson,* 973 F.2d 1518, 1521 (10th Cir. 1992). "On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Id.* (further citation omitted). In addition, a plaintiff's complaint may be treated as an affidavit where, as here, it "alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury." *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991). However, a court may not resolve material disputed issues of fact by accepting the *Martinez* report's factual findings when they are in conflict with pleadings or affidavits. *See id.* at 1109. "A bona fide factual dispute exists even when the plaintiff's factual allegations that

> conflict with the *Martinez* report are less specific or
> well-documented than those contained in the report." *Id.*

*Thomas v. Leslie,* 176 F.3d 489 (10th Cir. 1999) (unreported).[2]

    While this class action complaint was verified and sworn, the allegations therein only

generally and broadly describe what the prisoners as a class considered unacceptable conditions.

As this Court previously held, this matter is not proceeding as a class action, and Carroll

represents only himself. *See Doc. 51.*  Apparently Carroll understands that he can only pursue

claims for conditions that he personally experienced.  For example, in his responses to

Defendants' motion and *Martinez* report, Carroll drops claims that do not pertain to him,  clarifies

the precise factual basis for his personal claims already brought, and adds new claims of his own.

*Doc. 55, 56.*  These are the claims that are evaluated below.

## III. § 1997(e) "Claim" Is Not Cognizable

    At one point, Carroll contends that the CCCC grievance system was not certified by the

United States Attorney General under 42 U.S.C. § 1997e.  *Doc. 56* at 6.  To the extent Carroll

---

[2] Similarly, in *Gonzalez-Liranza v. Naranjo,* another recent unpublished Tenth Circuit decision arising from a case from this district, the Tenth Circuit explained that

> [w]hen, as here, a plaintiff's complaint is based on facts within his
> personal knowledge and has been sworn under penalty of perjury, it
> is to be treated as an affidavit.  [*Hall,* 935 F.2d at 1111].  We have
> held on numerous occasions that if the facts described in a *Martinez*
> report conflict with those set out in such a verified complaint,
> summary judgment may not be granted because such a conflict
> creates an issue of fact.  *See, e.g., Green v. Branson,* 108 F.3d
> 1296, 1302 (10th Cir. 1997); *Hayes v. Marriott,* 70 F.3d 1144, 1146
> (10th Cir. 1995); *Mosier v. Maynard,* 937 F.2d 1521, 1524 (10th
> Cir. 1991); *Hall,* 935 F.2d at 1111.

211 F.3d 1278 (10th Cir. 2000) (unpublished).

means to raise this as a separate claim, it is not cognizable.  First, he is citing a statute that has been superceded.  Second, under the present statute, there can be no action for "the failure of a State to adopt or adhere to an administrative grievance procedure."  42 U.S.C. § 1997e(b).

## III.  Eighth Amendment Prison Condition Claims

The vast majority of Carroll's complaint addresses prison conditions that are evaluated under the Eighth Amendment.  "To prevail on a conditions of confinement claim . . . an inmate must establish that (1) the condition complained of is sufficiently serious to implicate constitutional protection, and (2) prison officials acted with deliberate indifference to inmate health or safety."  *Despain v. Uphoff,* 264 F.3d 965, 971 (10th Cir. 2001) (internal quotations and citations omitted); *see also Shannon,* 257 F.3d at 1168 (first prong is objective component and second is subjective); *Craig v. Eberly,* 164 F.3d 490, 495 (10th Cir. 1998) (same; Eighth Amendment standards in pretrial detainee context).  Plaintiff's claims fail on both prongs.

### A.  Challenged Conditions Are Not "Sufficiently Serious"

It is well-settled that the conditions prisoners face by virtue of their incarceration can be "restrictive and even harsh" without running afoul of the Eighth Amendment. *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981); *see also e.g., Despain,* 264 F.2d at 973 (quoting *Barney v. Pulspher,* 143 F.3d 1299, 1331 (10th Cir. 1998), which in turn quotes *Rhodes*).  The "'Constitution does not mandate comfortable prisons' . . . and only those deprivations denying 'the minimal civilized measure of life's necessities' . . . are sufficiently grave to form the basis of an Eight Amendment violation."  *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347, 349).  "Life's necessities" are "identifiable human need[s]."  *Id.* at 304-05 (cumulative "overall conditions" not actionable under Eighth Amendment when "no specific

deprivation of a single human need exists"). Food, clothing, shelter, medical care, sanitation and reasonable measures by prison officials to ensure inmate safety comprise such "life necessities." *E.g., Despain,* 264 F.3d at 974; *Shannon,* 257 F.2d at 1168; *Craig,* 164 F.3d at 495.

### (1) Allegations of Inadequate "Useable" Space In Cells And Pod Area

CCCC was expanded and renovated between 1998 and 1999. The work was completed in October 1999, four months after the Idaho prisoners arrived. The facility had two types of cells: conventional jail cells and dormitory cells. Carroll was housed in "Pod A," a conventional style 7' x 11' or 77 square foot cell, with one toilet and one sink, which he shared with another inmate. These double-bunk cells share a 1,032 square feet common area and, absent an emergency, the individual cell doors are unlocked so that the prisoners can use the common area. *See Doc. 56,* at 2 (Carroll housed "unit 200, pod A"), *Doc. 55* at 3 ("plaintiff Carroll is not disputeing (sic) dormitory issues"); *Doc. 35,* Exh. 1 at ¶¶ 4, 8-9 (hereinafter "*Russell Aff.*").

The warden's affidavit asserts that even after adding the second bunk, "inmate-to-cell square footage ratio continues to be in compliance with the ACA standards." *Russell Aff.,* ¶ 6. Plaintiff asserts that double-bunking violates Federal Bureau of Prison standards. *Doc. 55* at 2, 6. Yet Plaintiff was not a federal prisoner, and, nevertheless, the warden's supplemental affidavit provides that the federal BOP later "approved CCCC's double bunking of prisoners, which was in effect at the time Mr. Carroll was an inmate." *Doc. 58,* Exh. 1, ¶ 4 (hereinafter "*Russell Supp. Aff.*"). Moreover, even though "standards promulgated by expert organizations such as the American Correctional Association may be informative in some instances, 'they simply do not establish the constitutional minima.' *Bell v. Wolfish,* 441 U.S. 520, 543-44 n. 27 (1979); *see also Rhodes,* [452 U.S. at 348 n. 13]." *Petrick v. Fields,* 103 F.3d 145 (10th Cir. 1996) (unpublished);

*see also Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir. 1980) ("state health code, while not establishing 'constitutional minima,' is relevant in making a finding regarding the constitutionality of existing conditions."), *cert. denied,* 450 U.S. 1041 (1981).

Carroll asserts that to arrive at a realistic "useable floor space" figure, one should subtract the space taken up by such things as bunks, storage lockers, tables and chairs. He recites that for thirty-eight inmates, the common area had a single microwave and television, three tables, and eighteen seats. He further asserts that the cells and common area of Pod A created an environment that was smelly, noisy and crowded with inmates bumping into each other and tensions running high. *See Doc. 56* at 2-3; *Doc. 55* at 2-3, 6.

The Supreme Court has found that a similar configuration/arrangement did not violate the Eighth Amendment. *See Rhodes*, 452 U.S. at 347. In *Rhodes,* the double-bunk cells contained a toilet, sink, and night stand and were only 63 square feet. The doors between the cells and the common area were closed except for a ten-minute period each hour when the prisoners could move from cell to common area. The inmates were locked in their cells from 9:30 p.m. until 6:30 the next morning. I cannot say that the situation complained of by Carroll is more restrictive than *Rhodes* configuration which was upheld as constitutional.

As to his cell, Carroll finally complains that although there were supposed to be two clothes hooks and shelves, there was only one of each. The warden asserts this is false, and I note Carroll never complained about this in any of his several grievances or in his letter to governors, legislators and the ACLU about the conditions at CCCC. *See Russell Aff.* ¶ 9; *Doc. 56* at 3; *id.,* Exhibits thereto (hereinafter "*Carroll's Grievance Exhs.*" which for ease of reading I will correct spelling errors when quoted ). Even if Carroll and his roommate had to share one shelve and one

hook, this does not deprive him of a "life necessity" or rise to the level of an Eighth Amendment violation.

### (2)  Carroll Was Not Deprived Of Any Of Life's Necessities

Carroll further contends that if the prison was building more beds, then it necessarily had to proportionately increase the square footage other shared facilities (e.g., kitchen, laundry, recreation areas, and general library).  *See Doc. 56* at 3, 4; *Doc. 55* at 3.  I find this argument patently frivolous, particularly in light of the uncontradicted evidence submitted by Defendants in their *Martinez* Report and Reply that the facilities were adequate.  Moreover, my specific findings below establish that Carroll was not personally deprived of "the minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 349.

*Carroll was not deprived of sufficient amounts of nutritional food.*  *See Doc. 54* at 11-12; *Doc. 58* at 5-7; *Doc. 35* at 10-12; *see also e.g., Ramos,* 639 F.2d at 571.  The inmates at CCCC were not fed grue or food loaf for meals – the meal plans submitted by Defendant show the inmates were served varied and balanced meals.  *Doc. 35, Exh. 3* (and attachments thereto).  Rather, Carroll grouses that he did not care for spicy New Mexican food or the way it was prepared by the kitchen, and occasionally food contained foreign objects such as hair.  *See Carroll's Grievance Exhs.* (1/9/00 kite asking "why is food so poorly prepared it is of little food value and cannot be eaten – over cooked, under cooked or spicy hot"); *Doc. 56* at 3 ("sand, rocks, hair, dirt, even pieces of black plastic . . . the food was not always served hot").

Simply put, food that sometimes contains foreign objects or is served cold does not amount to a constitutional deprivation.  *See Shannon v. Graves,* 2000 WL 206315 (D. Kan. 2000) (citing *Hamm v. DeKalb County,* 774 F.2d 1567, 1575 (11th Cir. 1985) [*cert. denied,* 475

U.S. 1096 (1986)]), *aff'd,* 257 F.3d 1164 (10th Cir. 2001). Moreover, finding prison meals to be unappealing to one's personal tastes does not serve as the benchmark against which constitutional rights are measured. *See e.g., Falter v. Veterans Administration,* 632 F. Supp. 196, 210-11 (D.N.J. 1986) (and cases discussed therein).

Finally, Carroll's allegations that the kitchen was not operating within health code regulations are conclusory and insufficient to create an issue of fact against the affidavits and supporting documentation that show to the contrary. *See Doc. 56* at 3-4 (and exhibits cited therein); *Carroll's Grievance Exhs.* (9/99 letter to legislators, etc). Where, as here, "food is prepared and served in a sanitary manner and is nutritionally adequate to maintain normal health, the fact that it is unappetizing" does not present an issue of constitutional proportions. *United States v. State of Mich.,* 680 F. Supp. 270, 275 (W.D. Mich. 1988).

***Carroll was not deprived of clean clothing or warmth.*** Rather, he alleges that: he received only two sets of underwear and socks in New Mexico whereas he had been issued three sets under Idaho prison regulations; he failed to receive a tee-shirt in New Mexico whereas he got one in Idaho; his winter coat was donated by a charity instead of provided by the prison; and he had to wear long johns and sweats to keep warm his cell in January. *Doc. 56* at 3, 4; ; *Doc. 55* at 4; *Carroll's Grievance Exhs* (1/9/00 and 11/9/99 kites). Even if true, these allegations do not establish that Carroll was deprived of clothing or unable to keep warm with the clothing he was issued.[3]

---

[3] *Russell Supp. Aff.* at ¶ 5 ("The CCCC issued cold weather jackets to all inmates, including Mr. Carroll, in September 1999. Mr. Carroll kept this jacket until he left the CCC in July, 2000. In addition, all CCCC inmates receive a standard clothing issue which included the following items: (1) shirt and pants (top and bottom); (2) underwear; (3) jacket; (4) socks; and (5) footwear.").

Moreover, Carroll indicates that was unhappy with the quality of laundered items he received on one occasion and that a pair of socks he was issued had a hole, but does not allege that he was prohibited from participating laundry exchange, where each inmate had "the opportunity to exchange underclothing, socks, and prison uniforms three times a week and other personal garments one time per week." *Russell Aff.* at ¶ 11. "These are one-for-one exchanges. That is, a prisoner turns in a soiled garment, and he is immediately issued a replacement garment of the same type and size." *Id.*

**Carroll was not deprived of safety.** In his letter to various legislators and others, Carroll stated that ten Idaho prisoners sexually assaulted another inmate, and he complained that the felony was not prosecuted. He also stated that several inmates had been beaten. *Carroll's Grievance Exhs.* (9/5/99 letter). Although Carroll contends that alleged overcrowding inevitably causes rapes and "fear of assault," *see Doc. 59* at 3; *Doc. 56* at 2-3, nowhere does he contend that he was ever attacked, threatened with attack, that correctional officers labeled him as a snitch, or that there was a particular spot in the prison where assaults were occurring with some frequency. Under these circumstances, a conclusory allegation based on a generalized fear of assault from other inmates is insufficient to state a claim under the Eighth Amendment.[4]

---

[4]  *Compare Riddle v. Mondragon,* 83 F.3d 1197, 1204-06 (10th Cir. 1996) (allegations that prison officials "failed in their obligation and responsibility to protect and preserve Plaintiff's safety and well-being. Plaintiff is exposed to adverse prison setting, constantly in fear of his life by physical assaults from other inmates who may discover his crime as sex offense at any time" held to fail to state Eighth Amendment claim); *with Benefield v. McDowall,* 241 F.3d 1267 (10th Cir. 2001) (apparently rejecting notion that "'psychological injury' caused by living in fear of other inmates is not compensable under the Eighth Amendment" in case where correctional officer alleged to have "put [a prisoner] in danger of attack or even death at the hands of other inmates by circulating rumors that he was a snitch and by showing other inmates a letter he allegedly wrote, indicating that he was giving information to the prison investigations staff" ), *and Collins v. Furlong,* 3 Fed.Appx. 886, 2001 WL 109159 (10th Cir. 2001) (unpublished) (reversing

### (3) Claims Regarding Non-Necessities

The remaining two "conditions" of which Carroll complains are newly raised in his responses. He first asserts that the telephone company servicing the prison overcharged him. This Court has no jurisdiction to review the amount of fees charged for the telephone calls under the arrangement the prison has with the long-distance carrier. *E.g., Arsberry v. Illinois,* 244 F.3d 558 (7th Cir. 2001) (suit by inmates and others under § 1983, the Sherman Act, and Illinois state law, attacking practice of prison granting one telephone company exclusive right to provide service in return for 50% of revenues and challenging rates as exorbitant; case dismissed for lack of jurisdiction under filed-rate and primary-jurisdiction doctrines). To the extent he claims he was charged for calls that were unclear or did not connect, his recourse lies with U.S. West.

Second, Carroll complains of perceived inadequacies in the general library (small selection of items, magazines not current, some books old and in bad repair). Carroll does not allege, however, that any request to receive a news publication was denied. *See Doc. 56* at 4; *Doc. 55* at 4, 6, 7. Under the circumstances presented by the allegations, neither perfect long distance service nor a large selection of new books or magazines constitute "necessities" as defined above and, therefore, the claims are not cognizable under the Eighth Amendment. *E.g., Smith v. Romer,* 107 F.3d 21 (10th Cir. 1997) (unpublished) ("Prisoners have no constitutional right to a range of educational or vocational opportunities during incarceration. . . . Similarly, they have a right to exercise, but not recreation.") (citation omitted).

---

summary judgment in favor of Defendants where inmate attacked in "blind spot of the prison yard nicknamed 'the thunderdome' . . . the site of at least three to four violent attacks each month" and there was evidence Defendants "actually knew of this risk").

### B. Liability Of Individual Defendants

The Defendants in this case are the warden of CCCC, the unidentified chairman of the Idaho Board of Corrections, the Board's director and several unnamed John Does. All three of the named defendants are sued in their individual and official capacities. The Eleventh Amendment bars recovery of damages from the named Idaho state defendants in their official capacities, however. To recover against the Cibola County warden in his official capacity "a plaintiff must show not only that a constitutional violation occurred, but also that some municipal policy or custom was the moving force behind the violation," *Myers v. Oklahoma County Bd. of County Com'rs,* 151 F.3d 1313, 1320 (10th Cir. 1998). The record is devoid of such a showing.

To recover against the named defendants in their individual capacities, they must have been personally involved in the alleged constitutional deprivation. Yet there is no allegation of their personal involvement save for a theory of recovery based on *respondeat superior.*[5] Finally, because there has been no constitutional deprivation, it would be futile to allow amendment to name John Does who personally participated in any of the alleged conduct.

## III.  Eighth Amendment Denial of Medical Care Claim

Carroll alleges there were three occasions when he received inadequate medical

---

[5]    *See Complaint* ¶ 2.4 (warden of CCCC is "responsible for the care and custody of all prisoners at CCCC.   He is also responsible for the operation and management of CCCC, including training and supervision of correctional staff"); *id.* ¶¶ 2.5, 2.6 (state defendants are responsible to ensure through "supervisory and monitory powers of private prison contractors that inmates entrusted to CCCC are properly treated" and responsible for the determination that CCCC is s suitable facility"); *see also Mitchell v. Maynard,* 80 F.3d 1433, 1441 (10th Cir. 1996) ("Although he does name the Warden and the Director of the Correctional facilities as defendants, supervisor status by itself is insufficient to support liability. . . .  Rather, '[p]ersonal participation is an essential allegation in a § 1983 claim.'")

treatment.[6]  It is well-settled that a difference of opinion over diagnosis or the appropriate course of medical treatment does not violate the Eighth Amendment standard of deliberate indifference to serious medical needs.  *See Estelle v. Gamble,* 429 U. S. 97, 107 (1976); *see also e.g., Perkins v. Kansas Dept. of Corrections,* 165 F.3d 803, 811 (10th Cir. 1999).  Two of the occasions of which Carroll complains – failure of unnamed medical personnel to follow up after treatment of a rash and hospitalization for fainting spells – fall into this category.

For example, Carroll alleges that the unnamed individual did not tell him what caused the rash and they did not "call him back for a followup" (presumably to see if the rash had gone away, which it did after three weeks with the antibiotics he was given).  *Doc. 56* at 5.  Likewise, Carroll alleges that on two occasions when he fainted he was taken to the hospital emergency room where "extensive tests were done," but thereafter medical personnel did not tell him what caused the spells or what the tests showed.  *Id.*  Moreover, there is no allegation that he continued to suffer from fainting spells.

The third occasion involved an alleged delay in receipt of dental care:

> [I] had three bad teeth that abscessed, I put in a kite for emergency services on Feb. 29, 2000 and was not seen, places a second kite on Mar. 3, 2000 and was not seen, and place a third kite on March 20, 2000 at which time I was finally seen and given medication to decrease abscess so they could work on my teeth and on March 22, 2000 the finally fixed my teeth.  I can assume it's understood the great amount of pain I went thru for 3 weeks and the serious health risks I faced from the infection; and the hunger and lost wieght from not being able to eat many foods (chewing) and effects of hot or cold food [no followup care].

---

[6]  In one of his responses, Carroll for the first time raises a denial of medical care claim. Although he did not request permission to amend, Defendants addressed the claim and I do so as well.

*Doc. 56,* at 4-5.  The contents of the last kite to which he refers are as follows:

> 3rd kite Feb 29 - Mar 13 Now – Need my teeth fixed today or I will take legal action 2 filling gone 2 more bad condition.  Inmate Signature [/s/ Roy Carroll].  Staff Response[:] Mr. Carroll informed that Dentist will not be @ facility until 3/22 & that he could see Dr. Windeck today 3/20 for concerns about abscess.  Staff Signature [/s/ Vanica Todd RW].

*Carroll's Grievance Exhs.*[7]  The medical record from his visit to the physician that day states:

> pt. complains of pain in left upper teeth for about 3 weeks.
> exam–alert, not in acute distress
> Gums appear sl red and swollen
> Impression – dental problem
> Rx amox 750 bid x 5 days
> Motrin 400 quid prn dental pain x 5 days
> Schedule with dentist for 3-22-00.

*Russell Supp. Aff.,* Exh. C.

A delay in medical or dental care can constitute an Eighth Amendment violation.  To prevail, the prisoner must show three things:  (1) the medical need was objectively "sufficiently serious," that is "'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,'" *Oxendine v. Kaplan,* 241 F.2d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999); (2) the delay in medical care "'resulted in substantial harm;'" *id.* (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1210 (10th Cir. 2000)); and (3) Defendants "knew he faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate

---

[7] Carroll does not explain why he failed to attach copies of the first two dental care kites to which he refers.  *See Carroll's Grievance Exhs.* (prisoners are to receive pink copy of the multi, carbon-copy form; six other kites in November 1999 and January 2000).  I will assume for the purposes of argument that the other two kites were sent and complained of tooth pain.  *See also infra* note 4.

it," *id.* (internal quotations and citations omitted).  Carroll's allegations fail at each element.

Although dental problems can result in serious conditions, they are different in character from manifestations of more dangerous illnesses or trauma such as heart attack symptoms.  Pain associated with a toothache is not necessarily an objectively serious condition.[8]  "[N]ot every twinge of pain suffered as the result of delay in medical care is actionable."  *Sealock,* 218 F.2d at 1210 (severe chest pain, accompanied by other symptoms indicative of heart attack meets objective test); *see also Oxendine,* 241 F.3d at 1278 (blackened and necrified tissue of reattached severed finger objectively serious).

As I read Carroll's pleadings and kite, he was asking that his teeth be fixed, which for whatever reasons was not scheduled immediately.  As the response to the kite reflects, he had the choice to see a physician until the dentist was scheduled to visit CCCC.  Plaintiff's failure to file a string of kites tends to support the physician's finding that Carroll was not in acute pain when he was examined in late March.

Carroll addresses the lack of requests for dental services by suggesting the prison lost them.  *See Doc. 56* at 6 ("concerns were ignored or often thrown away; grievance always disappeared with no answer, so the few concerns, and no grievance filed does not truely show all of my attempts to resolve").  Even assuming that Carroll meets the serious medical need prong,

---

[8] *See Harrison v. Barkley,* 219 F.3d 132, 137 (7th Cir. 2000) ("Ordinarily, a tooth cavity is not a serious medical condition, but that is at least in part because a cavity is so easily treatable.  Absent intense pain or other exigency, the treatment of a cavity (in or out of prison) can safely be delayed by the dentist's schedule or the patient's dread or neglect, can be subject to triage or the management of care, can be mitigated or repaired temporarily, and can be coordinated with other related conditions that need to be treated together.  Nevertheless, a tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction.").

however, he fails to meet the other two. A delay in medical care results in "substantial harm" when the outcome is "a lifelong handicap or a permanent loss," "life-threatening situations" such as heart attacks or, "instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *E.g., McBride v. Deer,* 240 F.3d 1287, 1289-90 (internal quotations and citations omitted) (delay of one month to treat pain associated with surgery for gunshot wound to leg resulted in prisoner losing "full function" of the leg). None of those situations are alleged or present here as Plaintiff's dental problems ceased when the dentist "fixed [his] teeth." The dental pain from of which Carroll complains is less serious, and certainly no greater than, the allegations made by the prisoner in *Grant v. Bernalillo County Detention Center,* CIV 98-633 LH/LFG, where the complaint was dismissed *sua sponte* under FED. R. CIV. P. 12(b)(6) and affirmed on appeal.[9]

---

[9] In *Grant,* the prisoner complained he fell and hurt his back in the shower but officials refused to take him for medical care until after the prisoner persistently complained. The Court noted that:

> we have rejected a prisoner's claim that requiring him to wait one to two years for an operation constituted cruel and unusual punishment under the Eighth Amendment, reasoning that he had failed to establish that the delay would cause further damage to his leg. *See White v. State of Colo.,* 82 F.3d 364, 366 (10th Cir. 1996).
>
> Applying these principles to Mr. Grant's allegations, we agree with the district court that he has failed to state an Eighth Amendment claim. With regard to his first fall, Mr. Grant alleges only that he was 'in bad pain' and that, when he was taken to a doctor '[a]fter some time,' he was informed that he 'had a pool of blood and some spin [sic] fluid.' . . . The potential seriousness of these injuries causes us some concern. However, Mr. Grant has failed to make any specific allegations as to the length of the delay in providing medical care, and he has failed to allege that this unspecified delay resulted in substantial harm.

173 F.3d 863, 1999 WL 157415 at *3 (10th Cir. 1999) (unpublished).

Finally, there is no allegation whatsoever that the named Defendants (wardens of CCCC and the Idaho prison) were informed about Carroll's complaints of tooth pain or that they were responsible for any delay in scheduling him to see the dentist. Also, because Carroll fails on the first two elements, as discussed above, any attempt to substitute the proper defendant for one of the "John Does" would be futile.

## IV. First Amendment Claim For Inspection Of Carroll's Outgoing Mail

Plaintiff contends that Defendants have unconstitutionally interfered with his outgoing mail. Defendants contend that this "outgoing mail" claim should be analyzed under the test announced in *Turner v. Safley,* 482 U.S. 78 (1987). However, the Supreme Court has since stated that "the logic of our analyses in [*Procunier v. Martinez,* 416 U.S. 396, 412-13 (1974)] and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989). Therefore, I apply the Supreme Court's analysis in *Martinez.*[10]

There are two aspects to the claim. Carroll first challenges CCCC's policy of policy of requiring inmates to leave outgoing mail open so that the mail room office staff can inspect it for "contraband such as drugs, gang literature, hard-core pornography and escape plans." *Doc. 35, Exh. 1 at ¶ 15 (hereinafter "Russell Aff.").* He argues that the mere act of inspection violates the First Amendment – that it is "wrong" to "have all mail sent out open" absent a "known, provable, penological risk." *Doc. 56 at 5.* However, under *Martinez*, as well as decisions in the Tenth and

---

[10] There is no allegation that Carroll's claim relates to legal mail. Indeed, the section of the Complaint that addresses this claim is limited to inmate personal mail, *see Complaint, ¶ 5.13,* and Carroll's responses specifically raise what happened to a piece of his personal mail, *see Doc. 56 at 5.*

other circuits, prison inspection of outgoing mail to look for contraband, etc. is permissible and

does not violate the First Amendment. *See Martinez,* 416 U.S. at 412-13.[11]

If the mail officer finds prohibited material in outgoing mail, CCCC regulations require

that the inmate to be notified and provided an opportunity to grieve the mail rejection. *Russell*

*Aff.,* ¶ 15. Plaintiff does not contend that any of his mail was rejected for delivery. Instead, he

argues that requiring inmates to leave their outgoing mail open can lead to mail being lost.

Indeed, one piece of mail sent to his parents arrived without the letter inside it. *See Doc. 56* at 5.

For a claim of non-delivery of the contents of mail the prisoner

> bears the burden of proving that his mail was not delivered, that
> [Defendant] was responsible for such nondelivery, and that
> [Defendant] acted intentionally or with deliberate indifference, *see*
> *Daniels v. Williams,* 474 U.S. 327, 328 (1986); *Hines v. Boothe,*
> 841 F.2d 623, 624 (5th Cir. 1988). The failure to establish any of
> these elements entitles [Defendant] to summary judgment.

*Treff v. Galetka,* 74 F.3d 191, 195 (10th Cir. 1996). There is simply nothing in the record by

allegation or otherwise that suggests the loss of this one letter was something other than an

_____

[11] *See also e.g.,Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999) ("prison security 'is a
sufficiently important governmental interest to justify limitations on a prisoner's first amendment
rights.' *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir. 1986). Accordingly, we have upheld
regulations authorizing prison officials to inspect incoming or outgoing non-legal mail for
contraband against First Amendment challenges. *See id.*"); *Koop v. Rolfs,* 129 F.3d 126 (9th Cir.
1997) (unpublished) ("prison officials may read out-going mail to see if it contains escape plans,
threats, or coded messages, *see Procunier*"); *Beville v. Ednie,* 74 F.3d 210, 214 (10th Cir. 1996)
("In order to enforce permissible restrictions which are reasonably related to substantial
government interests, corrections officers must be able to inspect all outgoing mail. . . .
[F]reedom from censorship is not equivalent to freedom from inspection or perusal." *Wolff v.*
*McDonnell,* 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974). Although the
inspection of mail may chill some inmate speech, it clearly satisfies the Supreme Court's mandates
in *Martinez* and *Abbott.* We hold that defendants did not violate Mr. Beville's rights when they
examined his outgoing nonlegal mail"), *implicit overruling on other grounds recognized, Tucker*
*v. Graves,* 107 F.3d 881 n. 2 (10th Cir. 1997) (unpublished) .

accident or simply negligence. Nothing connects the CCCC warden with the loss and the mail room officer is not a party. Thus, Plaintiff's allegations are insufficient to state a claim for a denial of his First Amendment rights and it would be futile to allow him to bring in a John Doe defendant on this claim.

Wherefore,

**IT IS HEREBY RECOMMENDED THAT** summary judgment be granted in favor of Defendants (*Doc. 53-1*) and that Plaintiff's motions for discovery and a hearing (*Docs. 60, 61, 65-1, 65-2*) be denied.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE